**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

RANDY DEVORIN,

        Plaintiff,

        v.

TATA CONSULTANCY SERVICES, LTD.,

        Defendant.

Case No. 2:24-cv-06648 (BRM) (JRA)

**OPINION**

MARTINOTTI, DISTRICT JUDGE

Before the Court is Defendant Tata Consultancy Services Limited's ("TCS") Motion (ECF No. 40) to Dismiss or, alternatively, stay certain claims in Plaintiff Randy Devorin's ("Plaintiff") Third Amended Complaint (ECF No. 27). Plaintiff opposes the Motion (ECF No. 41), and TCS filed a reply (ECF No. 42). Having reviewed the parties' submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Federal Rule of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown, TCS's Motion is **DENIED**.

## I.    BACKGROUND

### A.  Factual Background

For purposes of this motion to dismiss, the Court accepts the factual allegations in the complaint as true and draws all inferences in the light most favorable to the plaintiff. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*,

114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

Plaintiff is a former employee of TCS who was terminated from his position as "North American Regional Manager for Program Management" in September 2023. (ECF No. 27 ¶ 20.) Plaintiff alleges he is a "61-year-old white/Caucasian male and a citizen of the United States." (*Id.* ¶ 31.) TCS is an India-based corporation that provides information technology ("IT") and "business consulting services" worldwide. (*Id.* ¶¶ 21–22.)

Plaintiff alleges his termination from TCS relates to a concerted effort by TCS to replace older, U.S.-citizen employees with employees of Indian or South Asian origin and/or younger employees, in violation of federal and state anti-discrimination laws. (*Id.* ¶¶ 4–13, 39–40.) Plaintiff alleges TCS "is well-known for its use of work visas to employ Indian nationals (Southeast Asians) in the U.S." (*Id.* ¶ 25.) Plaintiff refers to instances in which he alleges TCS representatives expressed a desire "to decrease the percentage of American . . . employees in the U.S. from 70% to 50%" so it could "offer more global opportunities to its staff in India" (*id.* ¶ 26), as well as to hire Indian citizens located in the United States and to recruit recent college graduates, referred to as "freshers" (*id.* ¶¶ 27–29).

Plaintiff worked for TCS for over 10 years in its Global Consulting Practice, during which time he was promoted twice. (*Id.* ¶¶ 32–35.) Plaintiff alleges the employees in his group were primarily American, not of Indian or Southeast Asian descent, and served as TCS's "face" to American clients employing TCS for projects. (*Id.* ¶ 36.) In July of 2023, Plaintiff alleges he was informed "his group was being eliminated" and was instructed to apply for other roles within the company. (*Id.* ¶ 27.) Despite applying to more than 25 roles within TCS, Plaintiff was not offered another position at the company, nor did he make it past "the application stage" of consideration,

even though he was allegedly "highly qualified for these roles." (*Id.* ¶¶ 41–44.) Plaintiff alleges he learned his older, white American colleagues also struggled to secure new roles at TCS, but two Canadian citizens of Southeast Asian descent in his group were not laid off. (*Id.* ¶¶ 45, 47.) In contrast, Plaintiff claims TCS "affirmatively found a role for one younger . . . employee [of Indian descent]," and "[o]ut of the 14 Global Manager Partners that were laid off, the 3 Indian (Southeast Asian) Global Managing Partners were rehired into a different role while the rest were let go." (*Id.* ¶¶ 46, 48.) Plaintiff also alleges a TCS "Human Resources employee told other employees during an all-hands meeting that the Company planned to use money saved by closing down a unit that employed many of the American workers to provide jobs to more Indian nationals in the U.S.," which he believes referred to his group. (*Id.* ¶ 39.)

On September 20, 2023, Plaintiff alleges he was terminated "as part of a layoff and/or inability to find a new position within 30 days." (*Id.* ¶ 50.) Based on discussions with former colleagues, Plaintiff claims the layoff "targeted American citizens who are non-Indians/non-Southeast Asian employees and/or over 40 years of age." (*Id.* ¶ 51.) Plaintiff also alleges TCS failed to include an Older Worker's Benefit Protection Act disclosure in his severance agreement, even though the agreement requested he waive his rights under the Age Discrimination in Employment Act ("ADEA"). (*Id.* ¶ 52.)

Plaintiff makes additional allegations he claims demonstrate TCS engaged in discriminatory practices to favor younger workers of Southeast Asian descent over older American workers, including that TCS employed third-party recruiters to identify potential hires "of particular color, race, age and/or national origin," and that employees of Southeast Asian descent whose roles were eliminated around the time of Plaintiff's were given a longer period in which to find another placement within the company. (*Id.* ¶¶ 54–55.) Plaintiff was also allegedly told by

Indian supervisors that white female members of his team would be presented as part of the proposed team for a client proposal to showcase "diversity," even though they would not have a role in the project if engaged by the potential client. (*Id.* ¶ 58.) Plaintiff also points to a class action complaint in this District before the undersigned, *Katz v. Tata Consultancy Services, Ltd.*, 22-cv-7069 ("*Katz*"), to allege his experience with TCS is similar to that of other former employees who claim they were terminated in favor of employees of Indian or Southeast Asian descent.[1] (*Id.* ¶ 60.)

Plaintiff brings causes of action for age discrimination in violation of the ADEA, 29 U.S.C. § 623(a)(1) (Count I); discrimination on the basis of race and citizenship in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981") (Count II); and discrimination on the basis of race, color, and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 ("Title VII") and the Florida Civil Rights Act of 1992, §§ 760 *et seq.* (the "FCRA") (Counts III–V).[2] (*Id.* ¶¶ 61–99.) Plaintiff asks the Court for damages related to his employment, as well as emotional distress caused by TCS's allegedly unlawful conduct, liquidated and punitive damages, attorneys' fees and costs, and other appropriate relief. (*Id.* at Prayer for Relief.)

### B. Procedural History

Plaintiff filed his initial Complaint in the United States District Court for the Southern District of Florida on April 9, 2024 (ECF No. 1) and filed his First Amended Complaint on April

---

[1] Plaintiff brings an individual discrimination claim against TCS and states that, "[a]lthough *Katz* was filed as a class action, no motion for class certification has been filed." (ECF No. 27 ¶ 60 n.3.) Plaintiff states he will opt out of any class that might later be certified in *Katz* in order to pursue his claims individually. (*Id.*)

[2] Plaintiff alleges he properly exhausted his administrative remedies related to these causes of action by filing a Charge of Discrimination with Equal Employment Opportunity Commission and the Florida Commission on Human Relations. (*Id.* ¶¶ 16–19.)

26, 2024 (ECF No. 7). Upon a stipulation and motion by the parties that *Katz* was filed on December 7, 2022, in this District, and the "first-filed rule" likely required Plaintiff's case to be transferred to the same District (ECF No. 11 at 1–2), this matter was transferred to the District of New Jersey and assigned to the undersigned (ECF Nos. 13, 14).

Following transfer and grant of the parties' consent motions (ECF Nos. 18, 19, 24, 25, 26), Plaintiff filed a Second Amended Complaint on June 26, 2024 (ECF No. 20), and a Third Amended Complaint on August 20, 2024 (ECF No. 27), to which the Motion relates. After a pre-motion conference on October 8, 2024 (ECF No. 39), TCS filed the Motion to Dismiss on October 23, 2024 (ECF No. 40). Plaintiff filed his Opposition on October 30, 2024 (ECF No. 41), and TCS replied on November 12, 2024 (ECF No. 42).

## II.    LEGAL STANDARD

In deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint to allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must set out "sufficient factual matter" to show that the claim is facially plausible, allowing "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Supreme

Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

While, generally, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied* upon in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (emphasis added) (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

## III. DECISION

TCS asks this Court to dismiss without prejudice or, alternatively, stay Plaintiff's claims for race, national origin, and citizenship discrimination under either the first-filed rule or the Third Circuit's "prior pending" doctrine because it contends Plaintiff's claims have substantial overlap with *Katz* in terms of subject matter, issues of fact, legal claims, and parties.[3] (ECF No. 40-1 at 2–3, 8.) TCS also requests the Court dismiss Plaintiff's § 1981 claim for citizenship discrimination as not legally cognizable. (*Id.* at 21–23.) Finally, acknowledging Plaintiff's ADEA claim is distinct from the claims raised in *Katz*, TCS asks the Court to allow it to proceed separately from any claims the Court stays. (*Id.* at 23–24.)

---

[3] TCS contends Plaintiff's FCRA claims are also subject to the first-filed rule analysis and should be dismissed or stayed on that basis. (ECF No. 40-1 at 7–8 n.6.) As Plaintiff does not appear to contest this view, the Court treats his FCRA claims as rising or falling with the related federal claims in this analysis.

Plaintiff argues, now that his case has been transferred to this District, neither the first-filed rule nor the prior pending doctrine applies. (ECF No. 41 at 1–5.) He also argues his § 1981 claim based on citizenship is cognizable. (*Id.* at 5–6.)

### A. First-Filed Rule and Prior Pending Doctrine

#### 1. Applicability of First-Filed Rule

TCS argues the chronology of *Katz* and Plaintiff's matter and the overlapping subject matter, issues, legal claims, and parties mean the first-filed rule applies, and Plaintiff's case should be stayed or dismissed. (ECF No. 40-1 at 8.) TCS asserts *Katz* was filed first in time, on December 7, 2022, and the *Katz* complaint was amended twice in 2023 prior to Plaintiff's lawsuit, which was filed initially on April 9, 2024. (*Id.* at 10.) TCS also contends *Katz* has progressed procedurally in a manner supporting application of the first-filed rule to dismiss or stay Plaintiff's matter, as the Court has already granted TCS's motion to dismiss in part, the *Katz* plaintiffs have filed contested motions to amend the operative complaint twice, and the parties have engaged in discovery by exchanging written responses and beginning to produce documents. (*Id.*)

Regarding the subject matter and issues, TCS contends the "[p]laintiffs in the two cases rely on almost identical factual allegations in support of their ultimate argument" that TCS discriminates against employees not of Southeast Asian and/or Indian race or national origin, including "an alleged pattern of discrimination and discuss the same company practices related to visa usage, internal staffing, allocation, benching, interactions with the [TCS] Resource Management Group, and separations process." (*Id.* at 11.) Specifically, TCS asserts "the reorganization of the Consulting and Services Integration (C&SI) unit that led to [Plaintiff]'s separation is the exact same event that three of the four named plaintiffs in *Katz* have also alleged resulted in their termination and the issue is discussed at length in *Katz*'s Second Amended

8

Complaint." (*Id.*) Additionally, TCS points to an article from the *India Times*, which Plaintiff refers to in the Third Amended Complaint, that has become part of a dispute in *Katz* over whether the *Katz* plaintiffs' discovery requests are proper. (*Id.* at 11–12.) Further, Plaintiff's original Complaint, First Amended Complaint, and Second Amended Complaint explicitly incorporated the allegations and evidence in *Katz*, which TCS contends demonstrate the subject matter and issues here are "overwhelmingly similar." (*Id.* at 12 (quoting *Worthington v. Bayer Healthcare, LLC*, Civ. A. No. 11-2793, 2012 U.S. Dist. LEXIS 44880, at *12 (D.N.J. Mar. 30, 2012)).) TCS also argues the claims brought and remedies sought by Plaintiff compared to those in *Katz* support application of the first-filed rule, as both the Third Amended Complaint and the *Katz* complaint include causes of action under Title VII and § 1981 premised on TCS's alleged discriminatory practices and seek the same relief. (*Id.* at 12–13.) While Plaintiff is not a named party in *Katz*, TCS asserts he is a putative class member, even if he intends to opt out of any certified class, and this is sufficient for purposes of the first-filed rule. (*Id.* at 9, 13.) Finally, TCS argues there are no exceptional circumstances that justify departing from the first-filed rule, such as concerns of inequity or bad faith, and further contends a departure would be contrary to judicial economy and "require ongoing attention to ensure no inconsistent rulings or judgments occur." (*Id.* at 13–14.)

Plaintiff contests the applicability of the first-filed rule, arguing it ceased to be relevant once his case was transferred from the Southern District of Florida to this District. (ECF No. 41 at 1–2.) Plaintiff points to several Third Circuit cases he argues stand for the proposition that the first-filed rule has no applicability to an action "pending in the same Court before the same judge." (*Id.* (citing *Thomas v. Rite Aid of N.J., Inc.*, Civ. A. No. 09-5878, 2010 WL 11692499, at *2 (D.N.J. Aug. 4, 2010); *Alvarez v. Gold Belt, LLC*, Civ. A. No. 08–4871, 2009 WL 1473933, at *2–3 (D.N.J. May 26, 2009); *Premier Payments Online, Inc. v. Payment Sys. Worldwide*, 848 F. Supp. 2d 513,

523 (E.D. Pa. 2012)).) Plaintiff contends TCS presents no reason to disregard this proposition, and argues *Premier Payments Online*, 848 F. Supp. 2d at 522–23, presents a factually analogous situation in which the Eastern District of Pennsylvania found the first-filed rule did not apply. (*Id.* at 2.) In contrast, Plaintiff asserts two cases on which TCS relies dealt with second-filed matters which remained in different courts and are therefore inapposite. (*Id.* at 2–3 (citing *St. Paul Fire & Mar. Ins. Co. v. R&Q Reinsurance Co.*, Civ. A. No. 15-5528, 2016 WL 3087379, at *3 (E.D. Pa. June 2, 2016); *Chavez v. Dole Food Co., Inc.*, 796 F.3d 261, 266 (3d Cir. 2015)).) Further, Plaintiff argues his decision to pursue an individual claim and intent to opt out of any eventually certified class make the principles behind first-filed rule inapplicable, and he cites cases in which courts have found the rule does not apply to individual plaintiffs who file separately from an ongoing class action. (*Id.* at 3 (citing *Miller v. DirecTV, LLC*, Civ. A. No. 15-390, 2016 WL 816611, at *3 (M.D. Fla. Mar. 2, 2016); *Guyton v. Legacy Pressure Control, Inc.*, Civ. A. No. 15-1075, 2016 WL 5794801, at *2 (W.D. Tex. Oct. 4, 2016)).) Similarly, Plaintiff contends his ADEA claim makes his suit distinct from *Katz*. (*Id.*) Finally, Plaintiff asserts TCS's argument that his case should be stayed because the *Katz* class will likely be certified is disingenuous and inconsistent, as TCS "will undoubtedly oppose class certification" if filed for in *Katz*. (*Id.*)

In reply, TCS refutes Plaintiff's characterization of *St. Paul Fire* as involving a pending appeal in another jurisdiction because that court made clear "the first-filed rule 'survives' transfer of one action to the same court where the duplicative action is pending, which is exactly the situation here." (ECF No. 42 at 3–4 (citing *St. Paul Fire*, 2016 WL 3087379 at *3).) TCS further contends the two cases from this District Plaintiff cites "acknowledged that the principles behind the first-filed rule applied even to cases pending in the same jurisdiction" (*id.* at 4 (citing *Thomas*, 2010 WL 11692499 at *2; *Alvarez*, 2009 WL 1473933, at *2–3, *4)), and that other cases on which

Plaintiff relies turned on facts absent here, such as a stipulation to hear cases before the same judge or a finding of no substantial overlap of parties and issues (*id.* (citing *Premier Payments Online*, 848 F. Supp. 2d at 522–23; *Inn-One Home, LLC v. Colony Specialty Ins. Co.*, Civ. A. No. 18-00100, 2020 U.S. Dist. LEXIS 110730 (D. Vt. June 24, 2020))). TCS similarly argues Plaintiff's purported authority proposing that he may bring an individual claim distinct from *Katz*'s putative class action is distinguishable because in the cases he cites, the plaintiff was likely not within the proposed class definition, the parties and claims did not overlap, or the first-filed case was a collective action with an opt-in mechanism. (*Id.* at 5 (citing *Swetra v. DirecTV, LLC*, Civ. A. No. 15-8761, 2016 WL 4208440, at *3 (D.N.J. Aug. 9, 2016); *Miller*, 2016 WL 816611 at *3; *Guyton*, 2016 WL 5794801 at *2).) Moreover, TCS asserts Plaintiff wants to benefit from discovery in the class action, showing he considers himself part of *Katz*.[4] (*Id.*)

Under the first-filed rule, a district court has the discretion to "enjoin the subsequent prosecution of proceedings involving the same parties and the same issues already before another district court." *Spellman v. Express Dynamics, LLC*, 150 F. Supp. 3d 378, 386 (D.N.J. 2015) (citing *E.E.O.C. v. Univ. of Pa.*, 850 F.2d 969, 971 (3d Cir. 1988)). "In all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it." *Wheaton Indus., Inc. v. Aalto Sci., Ltd.*, Civ. A. No. 12-6965, 2013 WL 4500321, at *2 (D.N.J. Aug. 21, 2013) (internal citations and quotations omitted). "[T]he rule's primary purpose is to avoid burdening the federal judiciary and to prevent the judicial embarrassment of conflicting judgments." *E.E.O.C.*, 850 F.2d at 977 (internal citations omitted). "Yet, fundamental fairness dictates the need for fashioning a flexible response to the issue of concurrent jurisdiction." *Id.* (internal citations and

---

[4] However, TCS argues Plaintiff's burden in the employment discrimination context is to prove he was individually discriminated against, and he could not rely on the type of "pattern-and-practice" evidence used in a class action to do so. (ECF No. 40-1 at 5–7.)

quotations omitted). There are several exceptions to the first-filed rule, including: (1) rare or extraordinary circumstances; (2) inequitable conduct; (3) bad faith; (4) forum shopping; (5) the subsequently filed action further develops the case; and (6) the first party initiated suit in one forum in anticipation of the other party's imminent suit in a less favorable forum. *Id.*

The parties dispute whether the first-filed rule applies to two matters before the same district court and judge. As evidenced by the parties' briefings, courts in the Third Circuit have not provided a clear answer.[5] The case with the facts most analogous to those presented here is *Premier Payments Online*, 848 F. Supp. 2d at 522–23. There, the plaintiff filed suit over a business dispute with the defendant in the District Court for the Eastern District of Pennsylvania; a month later, the defendant filed a complaint regarding the same dispute in the District Court for the Eastern District of California. *See id.* at 517–18. Following oral argument on the plaintiff's motion to stay in the first-filed suit, the parties agreed to transfer the Eastern District of California case to the Eastern District of Pennsylvania and consolidate the matters. *See id.* at 518. Thereafter, the plaintiff moved to dismiss the transferred case under the first-filed rule, which the court rejected because the parties agreed to litigate in the Eastern District of Pennsylvania. *See id.* at 519, 522–23. The court also noted "courts have applied the first-filed rule in circumstances in which coordinate district courts have concurrent jurisdiction over different cases involving the same subject matter," whereas the cases at issue were before the same judge. *Id.* at 523. These facts mirror almost exactly the present circumstances: in their joint stipulation, the parties consented to transfer this case to this Court in light of the ongoing *Katz* litigation. (ECF No. 11 at 1–2.)

---

[5] *See, e.g.*, *Powell v. Wetzel*, Civ. A. No. 12-02455, 2017 U.S. Dist. LEXIS 127976, at *8 (M.D. Pa. Aug. 10, 2017) ("We find it unclear, however, whether the first-filed rule also applies when, as here, duplicative lawsuits have been filed successively in the same federal court.") (collecting cases reaching different results as to the first-filed rule's application to cases pending before the same district court).

However, the court in *Premier Payments* also found the second-filed suit was a compulsory counterclaim and judicial economy counseled consolidating the suits, a separate basis to reject a stay absent in this matter, where TCS is the defendant in both suits. *See Premier Payments Online*, 848 F. Supp. 2d at 524.

TCS is correct that some courts in this District have recognized the principles "behind the first-filed rule . . . are implicated" by cases involving the same issues and parties before the same court. *Alvarez*, 2009 WL 1473933 at *2–3 (quoting Third Circuit's statement of principles for first-filed rule and finding rule required staying matter until resolution of class certification issue in "fundamentally identical" case pending before different judge in same District); *see St. Paul Fire*, 2016 WL 3087379 at *3 (interpreting Third Circuit precedent indicating "the first-filed rule may apply even where 'concurrent jurisdiction no longer exist[s],' as long as the duplicative actions were initially filed in different jurisdictions" to find first-filed rule applied where first-filed case had been transferred to district of second-filed case). But other courts in this Circuit have questioned the wisdom of this approach to "parallel actions pending before" the same federal district court. *Glunk v. Noone*, Civ. A. No. 16-01147, 2016 WL 7159221, at *2 n.3 (M.D. Pa. Dec. 8, 2016) (noting Third Circuit's precedent on first-filed rule relates solely to cases of concurrent jurisdiction and counsels against dismissing matters with prejudice on that basis and deciding motion on *res judicata* grounds for lack of "binding authority" on issue), *aff'd*, 689 F. App'x 137 (3d Cir. 2017); *see also Elliott v. Williams*, Civ. A. No. 21-2290, 2022 WL 22907179, at *1 n.1 (E.D. Pa. May 19, 2022) (finding that, because other district court "exercised its discretion under

the first-filed rule and transferred this action to this Court, rather than dismissing it . . . applying the first-filed rule again as a grounds to dismiss the instant matter would be inappropriate").

Given the lack of clear precedent from or practice within this Circuit and recognizing the discretionary nature of the first-filed rule, *see Spellman*, 150 F. Supp. 3d at 386, the Court declines to apply the first-filed rule here, where both the first- and second-filed matters are subject to its jurisdiction. *See Premier Payments Online*, 848 F. Supp. 2d at 522–23; *Elliott*, 2022 WL 22907179 at *1 n.1. Moreover, Plaintiff and *Katz* do not seek to represent the same parties, as Plaintiff seeks only to represent himself. *See, e.g.*, *Abushalieh v. Am. Eagle Express*, 716 F. Supp. 2d 361, 366 (D.N.J. 2010) ("Where *each set of named plaintiffs intends to represent the other set*, the underlying principles of the first-filed rule [apply.]" (emphasis added)); *Swetra*, 2016 WL 4208440, at *3–4 (finding first-filed rule did not apply because, among other reasons, second-filed case involved individual plaintiff but first-filed case was class action); *Gaetano v. Gilead Scis., Inc.*, Civ. A. No. 21-01418, 2021 WL 3185822, at *7 n.8 (D.N.J. July 27, 2021) (finding first-filed rule did not apply because plaintiff, an individual, was not party to "mass action" plaintiffs in other district court and neither case sought to proceed as a class action); *see also Miller*, 2016 WL 816611, at *3 (holding first-filed rule inapplicable because plaintiff sought to bring an individual claim, stated he would opt out of first-filed class action if certified, and plaintiff alleged more causes of action than in first-filed class action).

### 2.  Applicability of Prior Pending Doctrine

Alternatively, TCS contends the Third Circuit's "prior pending doctrine" counsels dismissing Plaintiff's claims that overlap with *Katz*. (ECF No. 40-1 at 20.) Arguing this doctrine allows courts to dismiss a second-filed action "involving the same subject matter at the same time in the same court between the same parties," TCS asserts these factors are all met here. (*Id.* at 20–

21 (quoting *Powell*, 2017 U.S. Dist. LEXIS 127976, at \*12 (internal quotations omitted)).) Further, TCS argues "a district court may dismiss a duplicative lawsuit" based on its prerogative to manage its docket. (*Id.* at 21 (quoting *Fabics v. City of New Brunswick*, 629 F. App'x 196, 198 (3d Cir. 2015) (internal quotations omitted)).)

Plaintiff argues he is not a party to *Katz*, so the prior pending doctrine is inapplicable, pointing to Third Circuit law indicating unnamed putative class members are not considered "parties" until the class is certified. (ECF No. 42 at 4–5 (citing *N. Sound Cap. LLC v. Merck & Co.*, 938 F.3d 482, 492–93 (3d Cir. 2019)).)

As described in the Third Circuit's decision in *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977), a plaintiff "ha[s] no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant." *See also Fabics*, 629 F. App'x at 198–99 (affirming dismissal of second-filed complaint where many defendants were the same as those named in first-filed complaint, and second-filed complaint "was nearly identical to" plaintiffs' prior attempt to amend first-filed complaint). While courts in this Circuit have on occasion applied the prior pending doctrine to cases where parties have switched sides,[6] the doctrine is primarily concerned with preventing *plaintiffs* from "us[ing] the incorrect procedure of filing duplicative complaints for the purpose of circumventing the rules pertaining to the amendment of complaints" and other procedural rules. *Walton*, 563 F.2d at 71; *see also McKenna v. City of Phila.*, 304 F. App'x 89, 93 (3d Cir. 2008) (finding dismissal, stay, or consolidation of second-filed complaint would have been proper under *Walton* where plaintiff admitted second filing was "specifically intended to 'address[ ] a denial to amend'" first-filed complaint (alteration

---

[6] *See, e.g.*, *St. Paul Fire*, 2016 WL 3087379 at \*3 (finding prior pending doctrine was additional rationale to support dismissal where plaintiff filed second suit only after being sued by defendant in another district court).

in original)); *Powell*, 2017 U.S. Dist. LEXIS 127976 at *9–15 (emphasizing *Walton* found "a *plaintiff* is prohibited from maintaining two separate actions" involving same subject matter and defendants, and staying portions of amended complaint addressing same subject matter as previously filed case (emphasis added)).

Plaintiff is not one of the named plaintiffs in *Katz*, and that matter has yet to be certified, so he is not otherwise a party to *Katz. See N. Sound Cap. LLC*, 938 F.3d at 492–93. Therefore, he is not the "same" plaintiff as in *Katz*, and *Walton*'s prior pending doctrine does not apply.

Accordingly, TCS's Motion to dismiss or stay the claims overlapping with *Katz* is **DENIED**.[7]

### B. Cognizability of § 1981 Citizenship Claim

Separate from its arguments about the import of *Katz*, TCS contends Plaintiff does not state a claim for "citizenship discrimination" under § 1981 because such a cause of action is not cognizable under the statute for a U.S. citizen. (ECF No. 40-1 at 21–23.) TCS argues the statutory language—"[a]ll persons within the jurisdiction of the United States shall have the same right in every State . . . as is enjoyed by white citizens," 42 U.S.C. § 1981(a)—has consistently been interpreted "to protect against race and 'alienage' discrimination," meaning status as a non-citizen of the United States. (*Id.* at 21–22.) Because Plaintiff is a U.S. citizen, and not an alien non-citizen, TCS asserts he cannot bring a § 1981 claim on the basis of alienage, citing to cases in other Circuits to support this view. (*Id.* at 22 (citing *Meyenhofer v. Larsen & Toubro Infotech Ltd.*, 503 F. Supp. 3d 39, 49 (S.D.N.Y. 2020); *Von Maack v. Wyckoff Heights Med. Ctr.*, Civ. A. No. 15-3951, 2016 U.S. Dist. LEXIS 80879, at *46 (S.D.N.Y. June 21, 2016); *Juarez v. Nw. Mut. Life Ins. Co., Inc.*,

---

[7] TCS requested Plaintiff's ADEA claim be stayed or allowed to proceed separately in the event the Court granted the Motion with respect to Plaintiff's race and national origin claims. (ECF No. 40-1 at 23–24.) As the Court has denied the Motion, this request is also denied as moot.

69 F. Supp. 3d 364, 368–69 (S.D.N.Y. 2014); *Vaughn v. City of New York*, Civ. A. No. 06-6547, 2010 U.S. Dist. LEXIS 50791, at \*28 (E.D.N.Y. May 24, 2010); *Chaiffetz v. Robertson Rsch. Holding, Ltd.*, 798 F.2d 731, 735 (5th Cir. 1986)).) Anticipating Plaintiff's reliance on a recent decision from the Ninth Circuit, *Rajaram v. Meta Platforms, Inc.*, 105 F.4th 1179 (9th Cir. June 27, 2024), TCS argues that court's interpretation of § 1981 is incorrect, as evidenced by the reasoning of the dissenting opinion, and is not binding on this Court. (*Id.* at 22–23 (citing *Rajaram*, 105 F.4th at 1187, 1190–92 (VanDyke, J., dissenting)).)

Plaintiff argues he is entitled to pursue a § 1981 claim based on both his race and his U.S. citizenship. (ECF No. 41 at 5.) Relying primarily on *Rajaram*, Plaintiff asserts the statute's text "seeks equal protection between 'all persons' and 'white citizens' . . . . Thus, if a non-citizen (all persons) is being treated better than a U.S. citizen (white citizen), Section 1981 is violated, and the aggrieved person has a private right of action." (*Id.* (citing *Rajaram*, 105 F.4th at 1182; *Jimenez v. Servicios Agricolas Mex, Inc.*, 742 F. Supp. 2d 1078, 1085–86 (D. Ariz. 2010)).) Plaintiff contends TCS's reliance on the *Rajaram* dissent is misplaced because, in asserting the statutory reference to rights "as enjoyed by white citizens" would be unnecessary if U.S. citizens were meant to have a cause of action arising from it, "it is unclear how the word 'citizens' is redundant, while the word 'white' is not." (*Id.* at 6.) Instead, Plaintiff asserts § 1981 aims to ensure "all persons" and "white citizens" have equal protection, meaning neither category of persons is privileged over the other. (*Id.*) In Plaintiff's view, the citizenship discrimination he alleges is simply another form of "reverse discrimination," which he contends courts in the Third Circuit have "long recognized." (*Id.* (citing *MacLean v. Wipro Ltd.*, Civ. A. No. 20-3414, 2022 WL 4550629, at \*11 (D.N.J. Sept. 29, 2022)).)

In reply, TCS reiterates its view that the *Rajaram* majority wrongly construed the statutory language, adding that "the history behind Section 1981's language shows that the purpose of a

revised Section 1981 was to extend its protections to non-citizens, i.e. aliens, who were not covered by the original version of the statute, which prohibited only racial discrimination," not U.S. citizens. (ECF No. 42 at 8.) TCS further contends Plaintiff's assertion that the Third Circuit has recognized other forms of "reverse discrimination . . . misses the point" because this precedent does not create within § 1981 a statutory basis for Plaintiff's citizenship claim. (*Id.*)

The relevant text of § 1981 provides:

> *All persons within the jurisdiction of the United States shall have the same right in every State and Territory* to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens*, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a) (emphases added). As another court in this District recently noted, "[t]he Third Circuit was (and remains) a blank slate on [the] issue" of whether a U.S. citizen has a cognizable citizenship discrimination claim under the statute.[8] *MacLean v. Wipro Ltd.*, Civ. A. No. 20-3414, 2024 WL 5056383, at *3 n.1 (D.N.J. Dec. 10, 2024) (denying leave to add U.S. citizenship discrimination claim through amendment based on *Rajaram* opinion on unrelated grounds). While an issue of first impression in this Circuit and District, the parties' briefs cite diverging interpretations in other Circuit Courts of Appeals. *Compare Chaiffetz*, 798 F.2d at 735 (construing § 1981 not to permit employment discrimination claims on the basis of U.S. citizenship); *with Rajaram*, 105 F. 4th at 1182 (interpreting § 1981 to permit employment

---

[8] The only decision in this District to remotely approach this issue is *Sims v. Mercedes-Benz USA, LLC*, Civ. A. No. 16-9051, 2017 WL 3641743, at *5 (D.N.J. Aug. 24, 2017), where the court allowed the plaintiff, a Black American, to amend his complaint with allegations regarding the defendant's preference of German citizens "to the prejudice of U.S. citizens and residents, particularly racial minorities" because this fact could "still be relevant to his racial discrimination claim," but foreclosed amending to make a "national origin discrimination" claim under § 1981.

discrimination claims on the basis of U.S. citizenship).[9] Nonetheless, "[a]s with any question of statutory interpretation, '[the Court] must begin with the statutory text.'" *Khan v. Att'y Gen. of U.S.*, 979 F.3d 193, 197 (3d Cir. 2020) (quoting *A.A. v. Att'y Gen.*, 973 F.3d 171, 180 (3d Cir. 2020)); *see also Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."). To the extent *Chaiffetz* or *Rajaram* provide persuasive rationales for those courts' interpretations of the statutory text, this Court may rely on them to support its interpretation. *See, e.g.*, *Polansky v. Exec. Health Res. Inc*, 17 F.4th 376, 388 (3d Cir. 2021) (relying on Seventh Circuit's reading of "the text and structure of [statute], as well as settled canons of statutory interpretation" to support its own construction of statute, despite "contrary view of some [of] our sister Circuits"); *In re Asbestos Prods. Liab. Litig.*, 536 F. App'x 183, 187 n.12 (3d Cir. 2013) (supporting own interpretation of pendant party jurisdiction in actions removed under 28 U.S.C. § 1441(d) by referring to "other courts of appeals[']" reading of the statute's "plain language").

Upon review of the statutory text and the Supreme Court's precedents concerning the reading of § 1981, as well as the *Chaiffetz* and *Rajaram* decisions, this Court concurs with and adopts the opinion of the *Rajaram* majority that U.S. citizens may bring claims of discrimination on the basis of citizenship under the statute. To start, the Fifth and Ninth Circuits agree, and neither party disputes, that the Supreme Court has interpreted § 1981 to prohibit racial discrimination against white persons. *See Chaiffetz*, 798 F.2d at 735 (citing *McDonald v. Santa Fe Trails Transp. Co.*, 427 U.S. 273 (1976)); *Rajaram*, 105 F.4th at 1182 (citing same). In *McDonald*, white

---

[9] There is no dispute among the parties that § 1981 provides a cause of action for "violations of the nondiscrimination principles it sets out" (whatever those may be) in the private employment context, *Rajaram*, 105 F.4th at 1181 (citing *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 460 (1975)), nor does *Chaiffetz* imply otherwise, 798 F.2d at 735.

employees alleged they were discriminatorily discharged for an offense based on their race while a black employee who faced the same offense was not and brought suit under § 1981. *See McDonald*, 427 U.S. at 275. In reversing the lower courts to hold such a suit was cognizable under the statute, the Supreme Court examined the statutory text and noted "the statute explicitly applies to '[a]ll persons' . . . , including white persons." *Id.* at 287 (citing *United States v. Wong Kim Ark*, 169 U.S. 649, 675–76 (1898)). While opponents of this interpretation pointed to the phrase "as is enjoyed by white citizens" to argue the statute was not meant to provide such protection to white persons, the Supreme Court called this "a mechanical reading" and cited its own precedent affirming "this phrase simply as emphasizing 'the racial character of the rights being protected[.]'" *Id.* (quoting *Georgia v. Rachel*, 384 U.S. 780, 791 (1966)). While admittedly focused on the racial discrimination aspect of § 1981, the Supreme Court's interpretation makes clear the statute requires a comparison between the rights afforded "[a]ll persons" and the rights afforded "white citizens." *See id.*

Both Circuits also note that, in other cases, the Supreme Court has further elucidated what claims fall within this language, holding § 1981 prohibits discrimination on the basis of alienage, *see Graham v. Richardson*, 403 U.S. 365, 377 (1971) (citing *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 n.7 (1948)), and discrimination which links race and national origin, *see Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609–13 (1987) (referring to nineteenth-century dictionaries and encyclopedias which define and describe "race" as encompassing ideas related to familial or national origin and ethnic groups to conclude "Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics"). As the Ninth Circuit explains in *Rajaram*, these decisions also reflect an amendment to the text of § 1981 via Section 16 of the Enforcement

Act of 1870, ch. 114, § 16, 16 Stat. 140, 144, which changed the opening of § 1981 from "citizens" to "'all persons,' rather than 'citizens' alone[,]" "in response to California legislation restricting the rights of Chinese immigrants." *Rajaram*, 105 F.4th at 1183.

In light of this background, and this Court's obligation to "begin with the statutory text," *Khan*, 979 F.3d at 197, the Court agrees with the *Rajaram* majority that the language of § 1981 creates a cause of action for U.S. citizens, not just aliens, because it guarantees "[a]ll persons . . . the same right[s]" as "white citizens." 42 U.S.C. § 1981(a); *Rajaram*, 105 F.4th at 1182. The text's juxtaposition makes clear this guarantee hinges on an assessment of what rights "white citizens" possess "to make and enforce contracts" (as is relevant to the employment context). 42 U.S.C. § 1981(a); *Rajaram*, 105 F.4th at 1181. As explained by the majority in *Rajaram*, "[i]f some noncitizens have a *greater* right to make contracts than 'white citizens,' then it is not true that '[a]ll persons' have the '*same* right' to make contracts as 'white citizens.' That is precisely what the literal text of the statute prohibits." 105 F.4th at 1182. Put differently, "the statute states a principle of parity between 'all persons' and 'citizens,' violated if some persons have either greater or lesser rights than citizens." *Id.*

TCS relies on *Chaiffetz* and the dissent in *Rajaram* to argue that the interpretation put forth by the *Rajaram* majority is improper. (ECF No. 40-1 at 22–23.) The Court finds neither argument more persuasive than the opinion of the *Rajaram* majority. In *Chaiffetz*, the plaintiff described the defendants' conduct as "reverse discrimination on the basis of alienage." 798 F.2d at 735. The Fifth Circuit's discussion of citizenship discrimination in that case is relatively brief and makes no reference to the statutory text. *See id.* Instead, the Fifth Circuit rejected the appellant's argument based on logical reasoning alone: "Discrimination against whites is racial discrimination, but (in America) discrimination against Americans can never be discrimination based on *alienage.* It can

only be discrimination based on national origin, . . . which is unavailable to Chaiffetz." *Id.* But, as the *Rajaram* majority illustrates, whether Americans may be discriminated against as aliens is the wrong inquiry under the statute, *see Rajaram*, 105 F.4th at 1181–82; rather, § 1981 calls for a comparison between the rights of "white citizens" and "all persons" (in this case, non-citizens) and creates a cause of action to remedy any disparity that means these groups do not possess "the same right[s]," *id.*; 42 U.S.C. § 1981(a).

The *Rajaram* dissent, while thorough, does not ultimately convince this Court to take the dissent's view of § 1981 either. *See Rajaram*, 105 F.4th at 1187–93 (VanDyke, J., dissenting). The dissent criticizes the majority for basing its ruling on the Supreme Court's reading of § 1981 in *McDonald* because it "privileg[ed] legislative history over" the language of the statute, citing Congressional floor debates and the amendment process to counter the "mechanical reading of the phrase 'as is enjoyed by white citizens'" as exclusionary. *Id.* at 1188–89 (quoting *McDonald*, 427 U.S. at 287). The dissent therefore concludes the text of § 1981 does not clearly support the majority's reading, and as *McDonald*'s "long march through [the] legislative history" of § 1981 is the type of interpretive tool that has purportedly fallen out of favor, it cannot be relied for guidance. *Id.* at 1189; 1187 ("But the Supreme Court's reasoning in *McDonald* is nothing like the majority's 'textual' rationale here. That's because, . . . *McDonald* was written when the notion that one has to stick to the language and nothing else was not prevalent." (internal quotations omitted)).

However, this criticism ignores *Rajaram* majority's interpretive work grounded in the language of the statute. Focusing on the text itself, the majority identifies a clear comparison between the rights of "[a]ll persons" and the rights of "white citizens" to determine whether they are "the same." *Id.* at 1182. As the majority stated, "'the same' means 'the same.' It does not mean 'at least as great as,'" and they note there is no indication the meaning of "the same" has changed

dramatically since 1870. *Id.* Rather than relying primarily on *McDonald* (whatever one might make of its use of textual interpretation versus legislative history), the *Rajaram* majority puts forth a plain, textual basis for its reading that aligns with Supreme Court's holding in *MacDonald* (and perhaps strengthens the textual grounding of that result). *Id.* This interpretation also provides a response to the dissent's contention there is no "textual basis of leveling noncitizens down" to the level of white citizens, as the dissent's reading construes "the same" to mean "at least as great," and the *Rajaram* majority found there is no support for that definition of "the same."[10] *Id.* at 1190. Similarly, the dissent correctly explains how the amendment of § 1981 in 1870 to replace "citizens" with "all persons," "thereby add[ed] a ban on alienage discrimination . . . [without indicating] whether the law applied to discrimination purely *on the basis* of citizenship,"[11] *id.* at 1191, but this observation says nothing about the use of the phrase "the same" in the provision when read as a whole, *id.* at 1182. By its plain text, this change altered the thrust of the text only such that, instead of providing all citizens the same (*i.e.*, equivalent) rights as white citizens, the amended § 1981

---

[10] Additionally, while not contemporaneous with the language of § 1981, the Oxford English Dictionary's entry for "same" notes it has not been revised since its first edition in 1909, and no entry indicates a definition encompassing the idea that "same" could mean "equal or greater than," rather than "identical." *See Same (adj., pron., & adv.)*, Oxford Eng. Dictionary (Apr. 2025).

[11] "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Hayes v. Harvey*, 903 F.3d 32, 42 (3d Cir. 2018) (quoting *Ross v. Blake*, 578 U.S. 632, 641–42 (2016)) (cleaned up).

affirms that both non-white citizens and non-citizens enjoy the same guarantee of parity with the rights of white citizens.[12]

Accordingly, because Plaintiff alleges discrimination based on his status as a white, U.S. citizen, and TCS advances no argument regarding the sufficiency of his pleadings otherwise, Plaintiff's claim may proceed, and TCS's Motion to Dismiss the § 1981 claim is **DENIED**.

### IV.    CONCLUSION

For the reasons set forth above, and for good cause appearing, TCS's Motion to Dismiss is **DENIED**. An appropriate order follows.

Date: May 5, 2025                          */s/ Brian R. Martinotti*_____
                                            HON. BRIAN R. MARTINOTTI
                                            UNITED STATES DISTRICT JUDGE

---

[12] The *Rajaram* dissent also pokes at the majority's reading by asking, if Congress meant for § 1981 to be "a strict equalizing statute . . . why [include] 'as is enjoyed by white citizens' at all, since it seems entirely unnecessary," and TCS echoes this critique. *Rajaram*, 105 F.4th at 1187. But this reading ignores that "[t]he principal object of the [Civil Rights Act of 1866] was to eradicate the Black Codes, laws enacted by Southern legislatures imposing a range of civil disabilities on [freed slaves]." *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 386 (1982) (interpreting § 1981 to require proof of intentional discrimination for liability to attach); *see also Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 335 (2020) (citing *Gen. Bldg.* to support that § 1981's "language and history" confirmed necessity of but-for causation in suits under statute).